Opinion
KENNARD, J.
Acting on behalf of the public, plaintiff brought this action seeking monetary and injunctive relief under California laws designed to curb false advertising and unfair competition. Plaintiff alleged that defendant corporation, in response to public criticism, and to induce consumers to continue to buy its products, made false statements of fact about its labor practices and about working conditions in factories that make its products. Applying established principles of appellate review, we must assume in this opinion that these allegations are true.
*946 The issue here is whether defendant corporation’s false statements are commercial or noncommercial speech for purposes of constitutional free speech analysis under the state and federal Constitutions. Resolution of this issue is important because commercial speech receives a lesser degree of constitutional protection than many other forms of expression, and because governments may entirely prohibit commercial speech that is false or misleading.
Because the messages in question were directed by a commercial speaker to a commercial audience, and because they made representations of fact about the speaker’s own business operations for the purpose of promoting sales of its products, we conclude that these messages are commercial speech for purposes of applying state laws barring false and misleading commercial messages. Because the Court of Appeal concluded otherwise, we will reverse its judgment.
Our holding, based on decisions of the United States Supreme Court, in no way prohibits any business enterprise from speaking out on issues of public importance or from vigorously defending its own labor practices. It means only that when a business enterprise, to promote and defend its sales and profits, makes factual representations about its own products or its own operations, it must speak truthfully. Unlike our dissenting colleagues, we do not consider this a remarkable or intolerable burden to impose on the business community. We emphasize that this lawsuit is still at a preliminary stage, and that whether any false representations were made is a disputed issue that has yet to be resolved.
I. Facts
This case comes before us after the superior court sustained defendants’ demurrers to plaintiff’s first amended complaint. We therefore begin by summarizing that complaint’s allegations, accepting the truth of the allegations, as we must, for the limited purposes of reviewing the superior court’s ruling. (See Stevenson v. Superior Court (1997) 16 Cal.4th 880, 885 [66 Cal.Rptr.2d 888, 941 P.2d 1157]; accord, Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund (2001) 24 Cal.4th 800, 807 [102 Cal.Rptr.2d 562, 14 P.3d 234]; Santa Monica Beach, Ltd. v. Superior Court (1999) 19 Cal.4th 952, 957 [81 Cal.Rptr.2d 93, 968 P.2d 993].)
A. Allegations of the First Amended Complaint
Plaintiff Marc Kasky is a California resident suing on behalf of the general public of the State of California under Business and Professions *947 Code sections 17204 and 17535.[1] Defendant Nike, Inc. (Nike) is an Oregon corporation with its principal place of business in that state; Nike is authorized to do business in California and does promote, distribute, and sell its products in this state. The individual defendants (Philip Knight, Thomas Clarke, Mark Parker, Stephen Gomez, and David Taylor) are officers and/or directors of Nike.
Nike manufactures and sells athletic shoes and apparel. In 1997, it reported annual revenues of $9.2 billion, with annual expenditures for advertising and marketing of almost $1 billion. Most of Nike’s products are manufactured by subcontractors in China, Vietnam, and Indonesia. Most of the workers who make Nike products are women under the age of 24. Since March 1993, under a memorandum of understanding with its subcontractors, Nike has assumed responsibility for its subcontractors’ compliance with applicable local laws and regulations concerning minimum wage, overtime, occupational health and safety, and environmental protection.
Beginning at least in October 1996 with a report on the television news program 48 Hours, and continuing at least through November and December of 1997 with the publication of articles in the Financial Times, the New York Times, the San Francisco Chronicle, the Buffalo News, the Oregonian, the Kansas City Star, and the Sporting News, various persons and organizations alleged that in the factories where Nike products are made workers were paid less than the applicable local minimum wage; required to work overtime; allowed and encouraged to work more overtime hours than applicable local law allowed; subjected to physical, verbal, and sexual abuse; and exposed to toxic chemicals, noise, heat, and dust without adequate safety equipment, in violation of applicable local occupational health and safety regulations.
In response to this adverse publicity, and for the purpose of maintaining and increasing its sales and profits, Nike and the individual defendants made statements to the California consuming public that plaintiff alleges were false and misleading. Specifically, Nike and the individual defendants said that workers who make Nike products are protected from physical and sexual abuse, that they are paid in accordance with applicable local laws and regulations governing wages and hours, that they are paid on average double the applicable local minimum wage, that they receive a “living wage,” that they receive free meals and health care, and that their working conditions are in compliance with applicable local laws and regulations governing occupational health and safety. Nike and the individual defendants made these *948 statements in press releases, in letters to newspapers, in a letter to university presidents and athletic directors, and in other documents distributed for public relations purposes. Nike also bought full-page advertisements in leading newspapers to publicize a report that GoodWorks International, LLC, had prepared under a contract with Nike. The report was based on an investigation by former United States Ambassador Andrew Young, and it found no evidence of illegal or unsafe working conditions at Nike factories in China, Vietnam, and Indonesia.
Plaintiff alleges that Nike and the individual defendants made these false and misleading statements because of their negligence and carelessness and “with knowledge or reckless disregard of the laws of California prohibiting false and misleading statements.”
B. Superior Court Proceedings
Based on these factual allegations, plaintiff’s first amended complaint sought relief in the form of restitution requiring Nike to “disgorge all monies . . . acquired by means of any act found ... to be an unlawful and/or unfair business practice,” and relief in the form of an injunction requiring Nike to “undertake a Court-approved public information campaign” to correct any false or misleading statement, and to cease misrepresenting the working conditions under which Nike products are made. Plaintiff also sought reasonable attorney fees and costs and other relief that the court deemed just and proper.
Nike demurred to the first amended complaint on grounds, among others, that it failed to state facts sufficient to constitute a cause of action against Nike and that the relief plaintiff was seeking “is absolutely barred by the First Amendment to the United States Constitution and Article I, section 2(a) of the California Constitution.” The individual defendants separately demurred to the first amended complaint on the same grounds.
On January 7, 1999, the superior court held a hearing on defendants’ demurrers. At the hearing, the court stated that it considered the crucial question to be whether Nike’s allegedly false and misleading statements noted in the first amended complaint constituted commercial or noncommercial speech, because the answer to this question would determine the amount of protection the statements would receive under the federal and state constitutional free speech guarantees. After considering the arguments and authorities submitted by the parties, the court took the matter under submission and later sustained the demurrers without leave to amend. Plaintiff appealed from the judgment dismissing the complaint.
*949 C. Court of Appeal Proceedings
The Court of Appeal affirmed the judgment. Like the superior court, the appellate court identified as the crucial issue whether Nike’s allegedly false and misleading statements were commercial or noncommercial speech for purposes of analyzing the protections afforded by the First Amendment to the federal Constitution and by article I, section 2 of the California Constitution. Also like the superior court, the appellate court concluded that Nike’s statements were noncommercial speech and therefore subject to the greatest measure of protection under the constitutional free speech provisions. The court stated that this determination “compels the conclusion that the trial court properly sustained the defendants’ demurrer without leave to amend.” We granted plaintiff’s petition for review.
II. California Laws Prohibiting Consumer Deception
A. The Unfair Competition Law
California’s unfair competition law (UCL) (§ 17200 et seq.) defines “unfair competition” to mean and include “any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law (§ 17500 et seq.)].” (§ 17200.) The UCL’s purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. (Barquis v. Merchants Collection Assn. (1972) 7 Cal.3d 94, 110 [101 Cal.Rptr. 745, 496 P.2d 817].)
The UCL’s scope is broad. By defining unfair competition to include any “unlawful . . . business act or practice” (§ 17200, italics added), the UCL permits violations of other laws to be treated as unfair competition that is independently actionable. (Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co. (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527].) Here, for instance, plaintiff’s first amended complaint alleged that Nike and the individual defendants violated the UCL by committing actual fraud as defined in and prohibited by Civil Code section 1572 and deceit as defined in and prohibited by Civil Code sections 1709 and 1710. By defining unfair competition to include also any “unfair or fraudulent business act or practice”” (§ 17200, italics added), the UCL sweeps within its scope acts and practices not specifically proscribed by any other law. {Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra, at p. 180.) Plaintiff’s first amended complaint also alleged a UCL violation of this type.
Not only public prosecutors, but also “any person acting for the interests of. . . the general public,” may bring an action for relief under the *950 UCL. (§ 17204.) Under this provision, a private plaintiff may bring a UCL action even when “the conduct alleged to constitute unfair competition violates a statute for the direct enforcement of which there is no private right of action.” (Stop Youth Addiction, Inc. v. Lucky Stores, Inc. (1998) 17 Cal.4th 553, 565 [71 Cal.Rptr.2d 731, 950 P.2d 1086].) “This court has repeatedly recognized the importance of these private enforcement efforts.” (Kraus v. Trinity Management Services, Inc. (2000) 23 Cal.4th 116, 126 [96 Cal.Rptr.2d 485, 999 P.2d 718].)
In a suit under the UCL, a public prosecutor may collect civil penalties, but a private plaintiff’s remedies are “generally limited to injunctive relief and restitution.” (Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra, 20 Cal.4th at p. 179; see §§ 17203, 17206; ABC Internal Traders, Inc. v. Matsushita Electric Corp. (1997) 14 Cal.4th 1247, 1268 [61 Cal.Rptr.2d 112, 931 P.2d 290].) An order for restitution is one “compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken.” (Kraus v. Trinity Management Services, Inc., supra, 23 Cal.4th at pp. 126-127.)
B. The False Advertising Law
California’s false advertising law (§ 17500 et seq.) makes it “unlawful for any person, . . . corporation . . . , or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services ... or to induce the public to enter into any obligation relating thereto, to make or disseminate . . . before the public in this state, ... in any newspaper or other publication ... or in any other manner or means whatever . . . any statement, concerning that real or personal property or those services . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . .” (§ 17500.) Violation of this provision is a misdemeanor. {Ibid.) As with the UCL, an action for violation of the false advertising law may be brought either by a public prosecutor or by “any person acting for the interests of itself, its members or the general public,” and the remedies available to a successful private plaintiff include restitution and injunctive relief. (§ 17535.)
C. Common Features of the UCL and the False Advertising Law
This court has recognized that “[a]ny violation of the false advertising law . . . necessarily violates” the UCL. (Committee on Children’s Television, Inc. v. General Foods Corp. (1983) 35 Cal.3d 197, 210 [197 *951 Cal.Rptr. 783, 673 P.2d 660].) We have also recognized that these laws prohibit “not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.” (Leoni v. State Bar (1985) 39 Cal.3d 609, 626 [217 Cal.Rptr. 423, 704 P.2d 183].) Thus, to state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, “it is necessary only to show that ‘members of the public are likely to be deceived.’ ” (Committee on Children’s Television, Inc. v. General Foods Corp., supra, 35 Cal.3d at p. 211; accord, Bank of the West v. Superior Court (1992) 2 Cal.4th 1254, 1267 [10 Cal.Rptr.2d 538, 833 P.2d 545].)
III. Constitutional Protections for Speech
A. Federal Constitution
1. Constitutional text and its application to state laws
The United States Constitution’s First Amendment, part of the Bill of Rights, provides in part that “Congress shall make no law . . . abridging the freedom of speech . . . .” (U.S. Const., 1st Amend.) Although by its terms this provision limits only Congress, the United States Supreme Court has held that the Fourteenth Amendment’s due process clause makes the freedom of speech provision operate to limit the authority of state and local governments as well. (McIntyre v. Ohio Elections Comm’n (1995) 514 U.S. 334, 336, fn. 1 [115 S.Ct. 1511, 1514, 131 L.Ed.2d 426].)
2. Constitutional protection of commercial speech
Although advertising has played an important role in our nation’s culture since its early days, and although state regulation of commercial advertising and commercial transactions also has a long history, it was not until the 1970’ s that the United States Supreme Court extended First Amendment protection to commercial messages. In 1975, the court declared that it was error to assume “that advertising, as such, was entitled to no First Amendment protection.” (Bigelow v. Virginia (1975) 421 U.S. 809, 825 [95 S.Ct. 2222, 2234, 44 L.Ed.2d 600].) The next year, the court held that a state’s complete ban on advertising prescription drug prices violated the First Amendment. (Va. Pharmacy Bd. v. Va. Consumer Council (1976) 425 U.S. 748, 770 [96 S.Ct. 1817, 1829-1830, 48 L.Ed.2d 346].) The high court observed that “the free flow of commercial information is indispensable” not only “to the proper allocation of resources in a free enterprise system” but also “to the formation of intelligent opinions as to how that system ought to be regulated or altered.” (Id. at p. 765 [96 S.Ct. at p. 1827].)
*952 3. Tests for commercial and noncommercial speech regulations
“[T]he [federal] Constitution accords less protection to commercial speech than to other constitutionally safeguarded forms of expression.” (Bolger v. Youngs Drug Products Corp. (1983) 463 U.S. 60, 64-65 [103 S.Ct. 2875, 2878-2879, 77 L.Ed.2d 469] (Bolger).)
For noncommercial speech entitled to full First Amendment protection, a content-based regulation is valid under the First Amendment only if it can withstand strict scrutiny, which requires that the regulation be narrowly tailored (that is, the least restrictive means) to promote a compelling government interest. (United States v. Playboy Entertainment Group, Inc. (2000) 529 U.S. 803, 813 [120 S.Ct. 1878, 1886, 146 L.Ed.2d 865]; Consolidated Edison Co. v. Public Serv. Comm’n (1980) 447 U.S. 530, 540 [100 S.Ct. 2326, 2334-2335, 65 L.Ed.2d 319].)
“By contrast, regulation of commercial speech based on content is less problematic.” (Bolger, supra, 463 U.S. at p. 65 [103 S.Ct. at p. 2879].) To determine the validity of a content-based regulation of commercial speech, the United States Supreme Court has articulated an intermediate-scrutiny test. The court first articulated this test in Central Hudson Gas & Elec. v. Public Serv. Comm’n (1980) 447 U.S. 557 [100 S.Ct. 2343, 65 L.Ed.2d 341] (Central Hudson) and has since referred to it as the Central Hudson test. The court explained the components of the test this way: “At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.” (Id. at p. 566 [100 S.Ct. at p. 2351], italics added; accord, Lorillard Tobacco Co. v. Reilly (2001) 533 U.S. 525, 554 [121 S.Ct. 2404, 2421, 150 L.Ed.2d 532]; Greater New Orleans Broadcasting Assn., Inc. v. United States (1999) 527 U.S. 173, 183 [119 S.Ct. 1923, 1929-1930, 144 L.Ed.2d 161, 164 A.L.R.Fed. 711].) The court has clarified that the last part of the test—determining whether the regulation is not more extensive than “necessary”—does not require the government to adopt the least restrictive means, but instead requires only a “reasonable fit” between the government’s purpose and the means chosen to achieve it. (Board of Trustees, State Univ. of N. Y. v. Fox (1989) 492 U.S. 469, 480 [109 S.Ct. 3028, 3034-3035, 106 L.Ed.2d 388].)
*953 4. Regulation of false or misleading speech
“[T]here is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society’s interest in ‘uninhibited, robust, and wide-open’ debate on public issues.” (Gertz v. Robert Welch, Inc. (1974) 418 U.S. 323, 340 [94 S.Ct. 2997, 3007, 41 L.Ed.2d 789].) For this reason, “[u]ntruthful speech, commercial or otherwise, has never been protected for its own sake.” (Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at p. 771 [96 S.Ct. at p. 1830].)
Nevertheless, in some instances the First Amendment imposes restraints on lawsuits seeking damages for injurious falsehoods. It does so “to eliminate the risk of undue self-censorship and the suppression of truthful material” (Herbert v. Lando (1979) 441 U.S. 153, 172 [99 S.Ct. 1635, 1646, 60 L.Ed.2d 115]) and thereby to give freedom of expression the “ ‘breathing space’ ” it needs to survive (New York Times Co. v. Sullivan (1964) 376 U.S. 254, 272 [84 S.Ct. 710, 721-722, 11 L.Ed.2d 686, 95 A.L.R.2d 1412]; Bose Corp. v. Consumers Union of U.S., Inc. (1984) 466 U.S. 485, 513 [104 S.Ct. 1949, 1966-1967, 80 L.Ed.2d 502]). Thus, “some false and misleading statements are entitled to First Amendment protection in the political realm.” (Rubin v. Coors Brewing Co. (1995) 514 U.S. 476, 495 [115 S.Ct. 1585, 1596-1597, 131 L.Ed.2d 532] (conc. opn. of Stevens, J.).)
But the United States Supreme Court has explained that the First Amendment’s protection for false statements is not universal. (See Dun & Bradstreet, Inc. v. Greenmoss Builders (1985) 472 U.S. 749, 762 [105 S.Ct. 2939, 2946-2947, 86 L.Ed.2d 593] (plur. opn. of Powell, J.) [stating that when speech “concerns no public issue” and is “wholly false and clearly damaging,” it “warrants no special protection” under the First Amendment].) In particular, commercial speech that is false or misleading is not entitled to First Amendment protection and “may be prohibited entirely.” (In re R.M.J. (1982) 455 U.S. 191, 203 [102 S.Ct. 929, 937-938, 71 L.Ed.2d 64]; see also Edenfield v. Fane (1993) 507 U.S. 761, 768 [113 S.Ct. 1792, 1799, 123 L.Ed.2d 543] [observing that “the State may ban commercial expression that is fraudulent or deceptive without further justification”]; Bolger, supra, 463 U.S. at p. 69 [103 S.Ct. at p. 2881] [observing that “[t]he State may deal effectively with false, deceptive, or misleading sales techniques”]; Zauderer v. Office of Disciplinary Counsel (1985) 471 U.S. 626, 638 [105 S.Ct. 2265, 2275, 85 L.Ed.2d 652] [observing that “[t]he States and the Federal Government are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading”]; Central Hudson, supra, 447 U.S. at p. 566 [100 S.Ct. at p. 2351] [stating that for commercial speech to come within First Amendment protection “it. . . must. . . not be misleading”]; Bates v. *954 State Bar of Arizona (1977) 433 U.S. 350, 383 [97 S.Ct. 2691, 2709, 53 L.Ed.2d 810] [stating that “the leeway for untruthful or misleading expression that has been allowed in other contexts has little force in the commercial arena”].)
With regard to misleading commercial speech, the United States Supreme Court has drawn a distinction between, on the one hand, speech that is actually or inherently misleading, and, on the other hand, speech that is only potentially misleading. Actually or inherently misleading commercial speech is treated the same as false commercial speech, which the state may prohibit entirely. (In re supra, 455 U.S. at p. 203 [102 S.Ct. at pp. 937-938]; Ibanez v. Florida Dept, of Business and Professional Regulation, Bd. of Accountancy (1994) 512 U.S. 136, 150 [114 S.Ct. 2084, 2092-2093, 129 L.Ed.2d 118].) By comparison, “[s]tates may not completely ban potentially misleading speech if narrower limitations can ensure that the information is presented in a nonmisleading manner.” (Ibanez v. Florida Dept, of Business and Professional Regulation, Bd. of Accountancy, supra, at p. 152 [114 S.Ct. at p. 2093]; see also Peel v. Attorney Disciplinary Comm’n of Ill. (1990) 496 U.S. 91, 100 [110 S.Ct. 2281, 2287-2288, 110 L.Ed.2d 83]; In re R.M.J., supra, at p. 203 [102 S.Ct. at pp. 937-938].)
As one Supreme Court Justice has remarked, “the elimination of false and deceptive claims serves to promote the one facet of commercial price and product advertising that warrants First Amendment protection—its contribution to the flow of accurate and reliable information relevant to public and private decisionmaking.” (Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at p. 781 [96 S.Ct. at p. 1835] (cone. opn. of Stewart, J.); see also 44 Liquormart, Inc. v. Rhode Island (1996) 517 U.S. 484, 496, 501 [116 S.Ct. 1495, 1504-1505, 1507, 134 L.Ed.2d 711] (plur. opn. of Stevens, J.).) Thus, the high court has acknowledged that state laws may require a commercial message to “appear in such a form, or include such additional information, warnings, and disclaimers, as are necessary to prevent its being deceptive.” (Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at p. 772, fn. 24 [96 S.Ct. at p. 1830].) In the court’s words, “[t]he .First Amendment . . . does not prohibit the State from insuring that the stream of commercial information flow[s] cleanly as well as freely.” (Id. at pp. 771-772 [96 S.Ct. at pp. 1830-1831].)
5. Reasons for the distinction
The United States Supreme Court has given three reasons for the distinction between commercial and noncommercial speech in general and, more particularly, for withholding First Amendment protection from commercial speech that is false or actually or inherently misleading.
*955 First, “[t]he truth of commercial speech . . . may be more easily verifiable by its disseminator than . . . news reporting or political commentary, in that ordinarily the advertiser seeks to disseminate information about a specific product or service that he himself provides and presumably knows more about than anyone else.” (Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at p. 772, fn. 24 [96 S.Ct. at p. 1830], italics added; see also id. at p. Ill [96 S.Ct. at p. 1833] (conc. opn. of Stewart, J.) [stating that “[t]he advertiser’s access to the truth about his product and its price substantially eliminates any danger that governmental regulation of false or misleading price or product advertising will chill accurate and nondeceptive commercial expression”]; accord, 44 Liquormart, Inc. v. Rhode Island, supra, 517 U.S. at p. 499 [116 S.Ct. at p. 1506] (plur. opn. of Stevens, J.); Dun & Bradstreet, Inc. v. Greenmoss Builders, supra, 472 U.S. at p. 758, fn. 5 [105 S.Ct. at pp. 2944-2945] (plur. opn. of Powell, J.); Bose Corp. v. Consumers Union of U.S., Inc., supra, 466 U.S. at p. 504, fn. 22 [104 S.Ct. at pp. 1961-1962].)
Second, commercial speech is hardier than noncommercial speech in the sense that commercial speakers, because they act from a profit motive, are less likely to experience a chilling effect from speech regulation. (Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at pp. 771-772, fn. 24 [96 S.Ct. at p. 1830] [stating that “[s]ince advertising is the sine qua non of commercial profits, there is little likelihood of its being chilled by proper regulation and forgone entirely”]; accord, 44 Liquormart, Inc. v. Rhode Island, supra, 517 U.S. at p. 499 [116 S.Ct. at p. 1506] (plur. opn. of Stevens, J.); Board of Trustees, State Univ. of N.Y. v. Fox, supra, 492 U.S. at p. 481 [109 S.Ct. at p. 3035]; Dun & Bradstreet, Inc. v. Greenmoss Builders, supra, 472 U.S. at p. 758, fn. 5 [105 S.Ct. at pp. 2944-2945] (plur. opn. of Powell, J.).)
Third, governmental authority to regulate commercial transactions to prevent commercial harms justifies a power to regulate speech that is “ ‘linked inextricably’ to those transactions.” (44 Liquormart, Inc. v. Rhode Island, supra, 517 U.S. at p. 499 [116 S.Ct. at p. 1506] (plur. opn. of Stevens, J.); Edenfleld v. Fane, supra, 507 U.S. at p. 767 [113 S.Ct. at p. 1798]; Friedman v. Rogers (1979) 440 U.S. 1, 10, fn. 9 [99 S.Ct. 887, 894-895, 59 L.Ed.2d 100].) The high court has identified “preventing commercial harms” as “the typical reason why commercial speech can be subject to greater governmental regulation than noncommercial speech” (Cincinnati v. Discovery Network, Inc. (1993) 507 U.S. 410, 426 [113 S.Ct. 1505, 1515, 123 L.Ed.2d 99]), and it has explained that “[t]he interest in preventing commercial harms justifies more intensive regulation of commercial speech than noncommercial speech even when they are intermingled in the same publications” (id. at p. 426, fn. 21 [113 S.Ct. at p. 1515]). (See also Rubin v. *956 Coors Brewing Co., supra, 514 U.S. at p. 496 [115 S.Ct. at p. 1596] (conc. opn. of Stevens, J.) [stating that “[t]he evils of false commercial speech, which may have an immediate harmful impact on commercial transactions, together with the ability of purveyors of commercial speech to control falsehoods, explains why we tolerate more governmental regulation of this speech than of most other speech”].)
6. Distinguishing commercial from noncommercial speech
The United States Supreme Court has stated that the category of commercial speech consists at its core of “ ‘speech proposing a commercial transaction.’ ” (Central Hudson, supra, 447 U.S. at p. 562 [100 S.Ct. at p. 2349]; Bolger, supra, 463 U.S. at p. 66 [103 S.Ct. at pp. 2879-2880].) Although in one case the court said that this description was “the test for identifying commercial speech” (Board of Trustees, State Univ. of N. Y. v. Fox, supra, 492 U.S. at pp. 473-474 [109 S.Ct. at p. 3031]), in other decisions the court has indicated that the category of commercial speech is not limited to this core segment. For example, the court has accepted as commercial speech a statement of alcohol content on the label of a beer bottle (Rubin v. Coors Brewing Co., supra, 514 U.S. at pp. 481-482 [115 S.Ct. at p. 1589]), as well as statements on an attorney’s letterhead and business cards identifying the attorney as a CPA (certified public accountant) and CFP (certified financial planner) (Ibanez v. Florida Dept. of Business and Professional Regulation, Bd. of Accountancy, supra, 512 U.S. at p. 142 [114 S.Ct. at p. 2088]).
Bolger, supra, 463 U.S. 60, presented the United States Supreme Court with the question whether a federal law prohibiting the mailing of unsolicited advertisements for contraceptives violated the federal Constitution’s free speech provision as applied to certain mailings by a corporation that manufactured, sold, and distributed contraceptives. One category of mailings consisted of “informational pamphlets discussing the desirability and availability of prophylactics in general or [the corporation’s] products in particular.” (Id. at p. 62 [103 S.Ct. at p. 2878], fn. omitted.) The court noted that these pamphlets did not merely propose commercial transactions. (Id. at p. 66 [103 S.Ct. at pp. 2879-2880].) Although the pamphlets were conceded to be advertisements, that fact alone did not make them commercial speech because paid advertisements are sometimes used to convey political or other messages unconnected to a product or service or commercial transaction. (Ibid., citing New York Times Co. v. Sullivan, supra, 376 U.S. at pp. 265-266 [84 S.Ct. at pp. 718-719].) The court also found that references to specific products and the economic motivation of the speaker were each, considered in isolation, insufficient to make the pamphlets commercial speech. (Bolger, *957 supra, at pp. 66-67 [103 S.Ct. at pp. 2879-2880].) The court concluded, however, that the combination of these three factors—advertising format, product references, and commercial motivation—provided “strong support” for characterizing the pamphlets as commercial speech. (Id. at p. 67 [103 S.Ct. at p. 2880].)
In two important footnotes, the high court provided additional insight into the distinction between commercial and noncommercial speech. In one footnote, the court gave this caution: “[We do not] mean to suggest that each of the characteristics present in this case must necessarily be present in order for speech to be commercial. For example, we express no opinion as to whether reference to any particular product or service is a necessary element of commercial speech.” (Bolger, supra, 463 U.S. at p. 67, fn. 14 [103 S.Ct. at pp. 2880-2881].)
In the other footnote, after observing that one of the pamphlets at issue discussed condoms in general without referring specifically to the corporation’s own products, the court said: “That a product is referred to genetically does not, however, remove it from the realm of commercial speech. For example, a company with sufficient control of the market for a product may be able to promote the product without reference to its own brand names. Or a trade association may make statements about a product without reference to specific brand names.” (Bolger, supra, 463 U.S. at p. 66, fn. 13 [103 S.Ct. at p. 2880].)
Thus, although the court in Bolger, supra, 463 U.S. 60, identified three factors—advertising format, product references, and commercial motivation—that in combination supported a characterization of commercial speech in that case, the court not only rejected the notion that any of these factors is sufficient by itself, but it also declined to hold that all of these factors in combination, or any one of them individually, is necessary to support a commercial speech characterization.
The high court also cautioned, as it had in past cases, that statements may properly be categorized as commercial “notwithstanding the fact that they contain discussions of important public issues,” and that “advertising which ‘links a product to a current public debate’ is not thereby entitled to the constitutional protection afforded noncommercial speech,” explaining further that “[advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues.” (Bolger, supra, 463 U.S. at pp. 67-68 [103 S.Ct. at p. 2881], fn. omitted; accord, Board of Trustees, State Univ. of N.Y. v. Fox, supra, 492 U.S. 469, 475 [109 S.Ct. 3028, 3031-3032]; Zauderer v. *958 Office of Disciplinary Counsel, supra, 471 U.S. at p. 637, fn. 7 [105 S.Ct. at pp. 2274-2275]; see also Greater New Orleans Broadcasting Assn., Inc. v. United States, supra, 527 U.S. at p. 184 [119 S.Ct. at p. 1930] [recognizing that commercial speech may concern a “subject of intense public debate”].)
Since its decision in Bolger, supra, 463 U.S. 60, the United States Supreme Court has acknowledged that “ambiguities may exist at the margins of the category of commercial speech.” (Edenfield v. Fane, supra, 507 U.S. at p. 765 [113 S.Ct. at p. 1797]; see also Cincinnati v. Discovery Network, Inc., supra, 507 U.S. at p. 419 [113 S.Ct. at p. 1511] [recognizing “the difficulty of drawing bright Unes that will clearly cabin commercial speech in a distinct category”]; Zauderer v. Office of Disciplinary Counsel, supra, 471 U.S. at p. 637 [105 S.Ct. at p. 2274] [stating that “the precise bounds of the category of . . . commercial speech” are “subject to doubt, perhaps”].) Justice Stevens in particular has remarked that “the borders of the commercial speech category are not nearly as clear as the Court has assumed” (Rubin v. Coors Brewing Co., supra, 514 U.S. at p. 493 [115 S.Ct. at p. 1595] (conc. opn. of Stevens, J.)), and he has suggested that the distinction cannot rest solely on the form or content of the statement, or the motive of the speaker, but instead must rest on the relationship between the speech at issue and the justification for distinguishing commercial from noncommercial speech. In his words, “any description of commercial speech that is intended to identify the category of speech entitled to less First Amendment protection should relate to the reasons for permitting broader regulation: namely, commercial speech’s potential to mislead.” (Id. at p. 494 [115 S.Ct. at p. 1595] (conc. opn. of Stevens, J.).)
B. The State Constitution
1. Constitutional text
The California Constitution’s article I, entitled Declaration of Rights, guarantees freedom of speech in subdivision (a) of section 2. It provides: “Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press.” (Cal. Const., art. I, § 2, subd. (a).)
2. Scope of the state constitutional provision
The state Constitution’s free speech provision is “at least as broad” as (Gerawan Farming, Inc. v. Lyons (2000) 24 Cal.4th 468, 490 [101 Cal.Rptr.2d 470, 12 P.3d 720]) and in some ways is broader than (id. at *959 p. 491; Blatty v. New York Times Co. (1986) 42 Cal.3d 1033, 1041 [232 Cal.Rptr. 542, 728 P.2d 1177]) the comparable provision of the federal Constitution’s First Amendment.
3. Commercial speech protection under the state Constitution
The state Constitution’s free speech provision, which provides that “[e]very person may freely speak . . . on all subjects” (Cal. Const., art. I, § 2, subd. (a), italics added), protects commercial speech, at least when such speech is “in the form of truthful and nonmisleading messages about lawful products and services.” (Gerawan Farming, Inc. v. Lyons, supra, 24 Cal.4th at p. 493.) This court has indicated, however, that our state Constitution does not prohibit the imposition of sanctions for misleading commercial advertisements. (In re Morse (1995) 11 Cal.4th 184, 200, fn. 4 [44 Cal.Rptr.2d 620, 900 P.2d 1170].) Allowing such sanctions is consistent with the text of the state constitutional provision, which makes anyone who “abuse[s]” the right of freedom of speech “responsible” for the misconduct. (Cal. Const., art. I, § 2, subd. (a); see Brown v. Kelly Broadcasting Co. (1989) 48 Cal.3d 711, 746 [257 Cal.Rptr. 708, 111 P.2d 406].) Our Courts of Appeal have held that neither the UCL nor the false advertising law on its face violates the state Constitution’s free speech provision as an impermissible regulation of commercial speech. (People v. Superior Court (Olson) (1979) 96 Cal.App.3d 181, 195 [157 Cal.Rptr. 628], cert. den. (1980) 446 U.S. 935 [100 S.Ct. 2152, 64 L.Ed.2d 787]; accord, Keimer v. Buena Vista Books, Inc. (1999) 75 Cal.App.4th 1220, 1230, fn. 10 [89 Cal.Rptr.2d 781].)
This court has never suggested that the state and federal Constitutions impose different boundaries between the categories of commercial and noncommercial speech. In our most recent decision on this point, Leoni v. State Bar, supra, 39 Cal.3d 609 (Leoni), this court addressed whether an attorney’s solicitation of clients by means of allegedly misleading mass mailings and information was protected by the free speech provisions of the United States and California Constitutions. We used the same analysis for both constitutional provisions. (Id. at p. 614, fn. 2.) To determine whether the attorney’s mailings were commercial or noncommercial speech, we relied on the three factors that the United States Supreme Court had used in Bolger, supra, 463 U.S. 60: advertising format, product references, and economic motivation. After concluding that two of these factors were present (because the mailings referred specifically to the attorney’s services and the attorney had an economic motivation in sending them), we concluded that the presence of these two factors was sufficient to make the mailings commercial speech for purposes of the free speech protections of both the federal and the state Constitutions. (Leoni, supra, at pp. 623-624.)
*960 IV. Analysis
A. The United States Constitution
The United States Supreme Court has not adopted an all-purpose test to distinguish commercial from noncommercial speech under the First Amendment, nor has this court adopted such a test under the state Constitution, nor do we propose to do so here. A close reading of the high court’s commercial speech decisions suggests, however, that it is possible to formulate a limited-purpose test. We conclude, therefore, that when a court must decide whether particular speech may be subjected to laws aimed at preventing false advertising or other forms of commercial deception, categorizing a particular statement as commercial or noncommercial speech requires consideration of three elements: the speaker, the intended audience, and the content of the message.
In typical commercial speech cases, the speaker is likely to be someone engaged in commerce—that is, generally, the production, distribution, or sale of goods or services—or someone acting on behalf of a person so engaged, and the intended audience is likely to be actual or potential buyers or customers of the speaker’s goods or services, or persons acting for actual or potential buyers or customers, or persons (such as reporters or reviewers) likely to repeat the message to or otherwise influence actual or potential buyers or customers. Considering the identity of both the speaker and the target audience is consistent with, and implicit in, the United States Supreme Court’s commercial speech decisions, each of which concerned a speaker engaged in the sale or hire of products or services conveying a message to a person or persons likely to want, and be willing to pay for, that product or service. The high court has frequently spoken of commercial speech as speech proposing a commercial transaction (e.g., Central Hudson, supra, 447 U.S. at p. 562 [100 S.Ct. at p. 2349]), thus implying that commercial speech typically is communication between persons who engage in such transactions.
In Bolger, moreover, the court stated that in deciding whether speech is commercial, two relevant considerations are advertising format and economic motivation. (Bolger, supra, 463 U.S. at pp. 66-67 [103 S.Ct. at pp. 2879-2881].) These considerations imply that commercial speech generally or typically is directed to an audience of persons who may be influenced by that speech to engage in a commercial transaction with the speaker or the person on whose behalf the speaker is acting. Speech in advertising format typically, although not invariably, is speech about a product or service by a person who is offering that product or service at a price, directed to persons *961 who may want, and be willing to pay for, that product or service. Citing New York Times Co. v. Sullivan, supra, 376 U.S. 254, which concerned a newspaper advertisement seeking contributions for civil rights causes, the court cautioned, however, that presentation in advertising format does not necessarily establish that a message is commercial in character. (Bolger, supra, at p. 66 [103 S.Ct. at pp. 2879-2880].) Economic motivation likewise implies that the speech is intended to lead to commercial transactions, which in turn assumes that the speaker and the target audience are persons who will engage in those transactions, or their agents or intermediaries.
Finally, the factual content of the message should be commercial in character. In the context of regulation of false or misleading advertising, this typically means that the speech consists of representations of fact about the business operations, products, or services of the speaker (or the individual or company that the speaker represents), made for the purpose of promoting sales of, or other commercial transactions in, the speaker’s products or services. This is consistent with, and implicit in, the United States Supreme Court’s commercial speech decisions, each of which has involved statements about a product or service, or about the operations or qualifications of the person offering the product or service. (See, e.g., Rubin v. Coors Brewing Co., supra, 514 U.S. 476 [statement of alcohol content on beer bottle label]; Ibanez v. Florida Dept. of Business and Professional Regulation, Bd. of Accountancy, supra, 512 U.S. 136 [statements on an attorney’s letterhead and business cards describing attorney’s qualifications]; Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. 748 [advertisements showing prices of prescription drugs].)
This is also consistent with the third Bolger factor—product references. By “product references,” we do not understand the United States Supreme Court to mean only statements about the price, qualities, or availability of individual items offered for sale. Rather, we understand “product references” to include also, for example, statements about the manner in which the products are manufactured, distributed, or sold, about repair or warranty services that the seller provides to purchasers of the product, or about the identity or qualifications of persons who manufacture, distribute, sell, service, or endorse the product. Similarly, references to services would include not only statements about the price, availability, and quality of the services themselves, but also, for example, statements about the education, experience, and qualifications of the persons providing or endorsing the services. (See, e.g., Ibanez v. Florida Dept. of Business and Professional Regulation, Bd. of Accountancy, supra, 512 U.S. 136 [statements on an attorney’s letterhead and business cards describing attorney’s training and qualifications].) This broad definition of “product references” is necessary, we think, *962 to adequately categorize statements made in the context of a modem, sophisticated public relations campaign intended to increase sales and profits by enhancing the image of a product or of its manufacturer or seller.
Our understanding of the content element of commercial speech is also consistent with the reasons that the United States Supreme Court has given for denying First Amendment protection to false or misleading commercial speech. The high court has stated that false or misleading commercial speech may be prohibited because the truth of commercial speech is “more easily verifiable by its disseminator” and because commercial speech, being motivated by the desire for economic profit, is less likely than noncommercial speech to be chilled by proper regulation. (Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at p. 772, fn. 24 [96 S.Ct. atpp. 1830-1831].) This explanation assumes that commercial speech consists of factual statements and that those statements describe matters within the personal knowledge of the speaker or the person whom the speaker is representing and are made for the purpose of financial gain. Thus, this explanation implies that, at least in relation to regulations aimed at protecting consumers from false and misleading promotional practices, commercial speech must consist of factual representations about the business operations, products, or services of the speaker (or the individual or company on whose behalf the speaker is speaking), made for the purpose of promoting sales of, or other commercial transactions in, the speaker’s products or services. The United States Supreme Court has never decided whether false statements about a product or service of a competitor of the speaker would properly be categorized as commercial speech. Because the issue is not presented here, we offer no view on how it should be resolved.
Apart from this consideration of the identities of the speaker and the audience, and the contents of the speech, we find nothing in the United States Supreme Court’s commercial speech decisions that is essential to a determination that particular speech is commercial in character in the context of a consumer protection law intended to suppress false or deceptive commercial messages. Although in Bolger, supra, 463 U.S. 60, the United States Supreme Court noted that the speech at issue there was in a traditional advertising format, the court cautioned that it was not holding that this factor would always be necessary to the characterization of speech as commercial, and in Leoni, supra, 39 Cal.3d 609, this court held that an attorney’s mailings were commercial speech even though they were not in the form of an advertisement. (See also Ibanez v. Florida Dept. of Business and Professional Regulation, Bd. of Accountancy, supra, 512 U.S. 136 [accepting as commercial speech statements on an attorney’s letterhead and business cards].) Thus, advertising format is by no means essential to characterization as commercial speech.
*963 Here, the first element—a commercial speaker—is satisfied because the speakers—Nike and its officers and directors—are engaged in commerce. Specifically, they manufacture, import, distribute, and sell consumer goods in the form of athletic shoes and apparel.
The second element—an intended commercial audience—is also satisfied. Nike’s letters to university presidents and directors of athletic departments were addressed directly to actual and potential purchasers of Nike’s products, because college and university athletic departments are major purchasers of athletic shoes and apparel. Plaintiff has alleged that Nike’s press releases and letters to newspaper editors, although addressed to the public generally, were also intended to reach and influence actual and potential purchasers of Nike’s products. Specifically, plaintiff has alleged that Nike made these statements about its labor policies and practices “to maintain and/or increase its sales and profits.” To support this allegation, plaintiff has included as an exhibit a letter to a newspaper editor, written by Nike’s director of communications, referring to Nike’s labor policies practices and stating that “[c]onsumers are savvy and want to know they support companies with good products and practices” and that “[d]uring the shopping season, we encourage shoppers to remember that Nike is the industry’s leader in improving factory conditions.”
The third element—representations of fact of a commercial nature—is also present. In describing its own labor policies, and the practices and working conditions in factories where its products are made, Nike was making factual representations about its own business operations. In speaking to consumers about working conditions and labor practices in the factories where its products are made, Nike addressed matters within its own knowledge. The wages paid to the factories’ employees, the hours they work, the way they are treated, and whether the environmental conditions under which they work violate local health and safety laws, are all matters likely to be within the personal knowledge of Nike executives, employees, or subcontractors. Thus, Nike was in a position to readily verify the truth of any factual assertions it made on these topics.
In speaking to consumers about working conditions in the factories where its products are made, Nike engaged in speech that is particularly hardy or durable. Because Nike’s purpose in making these statements, at least as alleged in the first amended complaint, was to maintain its sales and profits, regulation aimed at preventing false and actually or inherently misleading speech is unlikely to deter Nike from speaking truthfully or at all about the conditions in its factories. To the extent that application of these laws may make Nike more cautious, and cause it to make greater efforts to verify the *964 truth of its statements, these laws will serve the purpose of commercial speech protection by “insuring that the stream of commercial information flow[s] cleanly as well as freely.” (Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at pp. 772 [96 S.Ct. at p. 1831.)
Finally, government regulation of Nike’s speech about working conditions in factories where Nike products are made is consistent with traditional government authority to regulate commercial transactions for the protection of consumers by preventing false and misleading commercial practices. Trade regulation laws have traditionally sought to suppress and prevent not only false or misleading statements about products or services in themselves but also false or misleading statements about where a product was made (see § 17533.7 [making it unlawful to sell a product falsely labeled as “Made in U.S.A.”]; 15 U.S.C. § 1125(a) [allowing damages for “false designation of origin”]), or by whom (see § 17520 et seq. [prohibiting false representation of product as made by blind workers]; § 17569 [prohibiting false representation of product “as made by authentic American Indian labor or workmanship”]; Lab. Code, § 1010 et seq. [prohibiting false labeling about the kind, character, or nature of labor employed in product’s manufacture]).
Because in the statements at issue here Nike was acting as a commercial speaker, because its intended audience was primarily the buyers of its products, and because the statements consisted of factual representations about its own business operations, we conclude that the statements were commercial speech for purposes of applying state laws designed to prevent false advertising and other forms of commercial deception. Whether these statements could properly be categorized as commercial speech for some other purpose, and whether these statements could properly be categorized as commercial speech if one or more of these elements was not fully satisfied, are questions we need not decide here.
Nike argues that its allegedly false and misleading statements were not commercial speech because they were part of “an international media debate on issues of intense public interest.” In a similar vein, our dissenting colleagues argue that the speech at issue here should not be categorized as commercial speech because, when Nike made the statements defending its labor practices, the nature and propriety of those practices had already become a matter of public interest and public debate. (Dis. opn. of Chin, J., post, at p. 974; dis. opn. of Brown, J., post, at pp. 980, 982-984.) This argument falsely assumes that speech cannot properly be categorized as commercial speech if it relates to a matter of significant public interest or controversy. As the United States Supreme Court has explained, commercial speech commonly concerns matters of intense public and private interest. *965 The individual consumer’s interest in the price, availability, and characteristics of products and services “may be as keen, if not keener by far, than his interest in the day’s most urgent political debate.” (Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at p. 763 [96 S.Ct. at p. 1826].) And for the public as whole, information on commercial matters is “indispensable” not only “to the proper allocation of resources in a free enterprise system” but also “to the formation of intelligent opinions as to how that system ought to be regulated or altered.” (Id. at p. 765 [96 S.Ct. at p. 1827]; see also Greater New Orleans Broadcasting Assn., Inc. v. United States, supra, 527 U.S. at p. 184 [119 S.Ct. at p. 1930] [observing that the commercial speech at issue there concerned “an activity that is the subject of intense debate in many communities”].)
In her dissent, Justice Brown states that our logic “erroneously assumes that false or misleading commercial speech . . . can never be speech about a public issue.” (Dis. opn. of Brown, J., post, at pp. 983-984.) On the contrary, we assume that commercial speech frequently and even normally addresses matters of public concern. The reason that it is “less necessary to tolerate inaccurate statements for fear of silencing the speaker” of commercial speech is not that such speech concerns matters of lesser public interest or value, but rather that commercial speech is both “more easily verifiable by its disseminator” and “less likely to be chilled by proper regulation.” (Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at p. 772, fn. 24 [96 S.Ct. at pp. 1830-1831; accord, Lorillard Tobacco Co. v. Reilly, supra, 533 U.S. at p. 576 [121 S.Ct. at p. 2433].)
In support of their argument that speech about issues of public importance or controversy must be considered noncommercial speech, our dissenting colleagues cite Thomas v. Collins (1945) 323 U.S. 516 [65 S.Ct. 315, 89 L.Ed. 430], and Thornhill v. State of Alabama (1940) 310 U.S. 88 [60 S.Ct. 736, 84 L.Ed. 1093]. The United States Supreme Court issued these decisions three decades before it developed the modem commercial speech doctrine in Bigelow v. Virginia, supra, 421 U.S. 809, and Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. 748. Moreover, neither decision addressed the validity of a law prohibiting false or misleading speech. To the extent they hold that truthful and nonmisleading speech about commercial matters of public importance is entitled to constitutional protection, they are consistent with the modem commercial speech doctrine and with the decision we reach today. We find nothing in either decision suggesting that the state lacks the authority to prohibit false and misleading factual representations, made for purposes of maintaining and increasing sales and profits, about the speaker’s own products, services, or business operations.
For purposes of categorizing Nike’s speech as commercial or noncommercial, it does not matter that Nike was responding to charges publicly raised *966 by others and was thereby participating in a public debate. The point is illustrated by a decision of a federal court of appeals about statements by a trade association denying there was scientific evidence that eating eggs increased the risk of heart and circulatory disease. (National Commission on Egg Nutrition v. Federal Trade Commission (7th Cir. 1977) 570 F.2d 157, 159, cert. den. (1978) 439 U.S. 821 [99 S.Ct. 86, 58 L.Ed.2d 113].) The court held that these statements were commercial speech subject to regulation by the Federal Trade Commission (FTC) to the extent the statements were false or misleading, even though the trade association made the statements “to counteract what the FTC described as ‘anti-cholesterol attacks on eggs which had resulted in steadily declining per capita egg consumption.’ ” (Id. at p. 159.) Responding to the argument that the statements were noncommercial because they concerned a debate on a matter of great public interest, the federal court of appeals responded that “the right of government to restrain false advertising can hardly depend upon the view of an agency or court as to the relative importance of the issue to which the false advertising relates.” (Id. at p. 163.)
Here, Nike’s speech is not removed from the category of commercial speech because it is intermingled with noncommercial speech. To the extent Nike’s press releases and letters discuss policy questions such as the degree to which domestic companies should be responsible for working conditions in factories located in other countries, or what standards domestic companies ought to observe in such factories, or the merits and effects of economic “globalization” generally, Nike’s statements are noncommercial speech. Any content-based regulation of these noncommercial messages would be subject to the strict scrutiny test for fully protected speech. (See, e.g., Consolidated Edison Co. v. Public Serv. Comm’n, supra, 447 U.S. 530.) But Nike may not “immunize false or misleading product information from government regulation simply by including references to public issues.” (Bolger, supra, 463 U.S. at p. 68 [103 S.Ct. at p. 2881], fn. omitted.) Here, the alleged false and misleading statements all relate to the commercial portions of the speech in question—the description of actual conditions and practices in factories that produce Nike’s products—and thus the proposed regulations reach only that commercial portion.
Asserting that the commercial and noncommercial elements in Nike’s statement were “inextricably intertwined,” our dissenting colleagues maintain that it must therefore be categorized as noncommercial speech, and they cite in support the United States Supreme Court’s decision in Riley v. National Federation of Blind (1988) 487 U.S. 781 [108 S.Ct. 2667, 101 L.Ed.2d 669] (Riley). That decision concerned regulation of charitable solicitations, a category of speech that does not fit within our limited-purpose *967 definition of commercial speech because it does not involve factual representations about a product or service that is offered for sale. More importantly, the high court has since explained that in Riley “the commercial speech (if it was that) was ‘inextricably intertwined’ because the state law required it to be included” and that commercial and noncommercial messages are not “inextricable” unless there is some legal or practical compulsion to combine them. (Board of Trustees, State Univ. of N.Y. v. Fox, supra, 492 U.S. at p. 474 [109 S.Ct. at p. 3031], italics omitted.) No law required Nike to combine factual representations about its own labor practices with expressions of opinion about economic globalization, nor was it impossible for Nike to address those subjects separately.
We also reject Nike’s argument that regulating its speech to suppress false and misleading statements is impermissible because it would restrict or disfavor expression of one point of view (Nike’s) and not the other point of view (that of the critics of Nike’s labor practices). The argument is misdirected because the regulations in question do not suppress points of view but instead suppress false and misleading statements of fact. As we have explained, to the extent Nike’s speech represents expression of opinion or points of view on general policy questions such as the value of economic “globalization,” it is noncommercial speech subject to full First Amendment protection. Nike’s speech loses that full measure of protection only when it concerns facts material to commercial transactions—here, factual statements about how Nike makes its products.
Moreover, differential treatment of speech about products and services based on the identity of the speaker is inherent in the commercial speech doctrine as articulated by the United States Supreme Court. A noncommercial speaker’s statements criticizing a product are generally noncommercial speech, for which damages may be awarded only upon proof of both falsehood and actual malice. (See, e.g., Bose Corp. v. Consumers Union of U.S., Inc., supra, 466 U.S. at p. 513 [104 S.Ct. at pp. 1966-1967] [so treating unflattering statements in a consumer magazine’s review of high fidelity speakers].) A commercial speaker’s statements in praise or support of the same product, by comparison, are commercial speech that may be prohibited entirely to the extent the statements are either false or actually or inherently misleading. (In re R.M.J., supra, 455 U.S. at p. 203 [102 S.Ct. at pp. 937-938].) To repeat, the justification for this different treatment, as the high court has explained, is that when a speaker promotes its own products, it is “less necessary to tolerate inaccurate statements for fear of silencing the speaker” because the described speech is both “more easily verifiable by its disseminator” and “less likely to be chilled by proper regulation.” (Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at p. 772, fn. 24 [96 *968 S.Ct. at pp. 1830-1831]; accord, Lorillard Tobacco Co. v. Reilly, supra, 533 U.S. at p. 576 [121 S.Ct. at p. 2433].)
Our dissenting colleagues are correct that the identity of the speaker is usually not a proper consideration in regulating speech that is entitled to First Amendment protection, and that a valid regulation of protected speech may not handicap one side of a public debate. But to decide whether a law regulating speech violates the First Amendment, the very first question is whether the speech that the law regulates is entitled to First Amendment protection at all. As we have seen, commercial speech that is false or misleading receives no protection under the First Amendment, and therefore a law that prohibits only such unprotected speech cannot violate constitutional free speech provisions.
We conclude, accordingly, that here the trial court and the Court of Appeal erred in characterizing as noncommercial speech, under the First Amendment to the federal Constitution, Nike’s allegedly false and misleading statements about labor practices and working conditions in factories where Nike products are made.
We now disapprove as ill-considered dicta two statements of this court in Spiritual Psychic Science Church v. City of Azusa (1985) 39 Cal.3d 501 [217 Cal.Rptr. 225, 703 P.2d 1119]. There we remarked that commercial speech is speech “which has but one purpose—to advance an economic transaction,” and we suggested that “an advertisement informing the public that the cherries for sale at store X were picked by union workers” would be noncommercial speech. (Id. at p. 511.)
As we have explained, the United States Supreme Court has indicated that economic motivation is relevant but not conclusive and perhaps not even necessary. (Bolger, supra, 463 U.S. at p. 67 & fn. 14 [103 S.Ct. at. pp. 2880-2881].) The high court has never held that commercial speech must have as its only purpose the advancement of an economic transaction, and it has explained instead that commercial speech may be intermingled with noncommercial speech. (Id. at pp. 67-68 [103 S.Ct. at pp. 2880-2881].) An advertisement primarily intended to reach consumers and to influence them to buy the speaker’s products is not exempt from the category of commercial speech because the speaker also has a secondary purpose to influence lenders, investors, or lawmakers.
Nor is speech exempt from the category of commercial speech because it relates to the speaker’s labor practices rather than to the price, availability, or quality of the speaker’s goods. An advertisement to the public that *969 cherries were picked by union workers is commercial speech if the speaker has a financial or commercial interest in the sale of the cherries and if the information that the cherries had been picked by union workers is likely to influence consumers to buy the speaker’s cherries. Speech is commercial in its content if it is likely to influence consumers in their commercial decisions. For a significant segment of the buying public, labor practices do matter in making consumer choices.
B. The California Constitution
In the few cases in which this court has addressed the distinction between commercial and noncommercial speech, we have not articulated a separate test for determining what constitutes commercial speech under the state Constitution, but instead we have used the tests fashioned by the United States Supreme Court. For example, in Leoni, supra, 39 Cal.3d 609, we used the three-factor test the high court had articulated in Bolger, supra, 463 U.S. 60, and we concluded that the speech in question was commercial speech because two of the three factors were present. So also here, we perceive no need to articulate a separate test for commercial speech under the state Constitution. Having concluded that the speech at issue is commercial speech under the federal Constitution, we now reach the same conclusion under the California Constitution.
V. Conclusion
As the United States Supreme Court has explained, false and misleading speech has no constitutional value in itself and is protected only in circumstances and to the extent necessary to give breathing room for the free debate of public issues. Commercial speech, because it is both more readily verifiable by its speaker and more hardy than noncommercial speech, can be effectively regulated to suppress false and actually or inherently misleading messages without undue risk of chilling public debate. With these basic principles in mind, we conclude that when a corporation, to maintain and increase its sales and profits, makes public statements defending labor practices and working conditions at factories where its products are made, those public statements are commercial speech that may be regulated to prevent consumer deception.
Sprinkled with references to a series of children’s books about wizardry and sorcery, Justice Brown’s dissent itself tries to find the magic formula or incantation that will transform a business enterprise’s factual representations in defense of its own products and profits into noncommercial speech exempt from our state’s consumer protection laws. As we have explained, *970 however, such representations, when aimed at potential buyers for the purpose of maintaining sales and profits, may be regulated to eliminate false and misleading statements because they are readily verifiable by the speaker and because regulation is unlikely to deter truthful and nonmisleading speech.
In concluding, contrary to the Court of Appeal, that Nike’s speech at issue here is commercial speech, we do not decide whether that speech was, as plaintiff has alleged, false or misleading, nor do we decide whether plaintiff’s complaint is vulnerable to demurrer for reasons not considered here. Because the demurrers of Nike and the individual defendants were based on multiple grounds, further proceedings on the demurrers may be required in the Court of Appeal, the superior court, or both. Our decision on the narrow issue before us on review does not foreclose those proceedings.
The judgment of the Court of Appeal is reversed, and the matter is remanded to that court for further proceedings consistent with this opinion.
George, C. J., Werdegar, J., and Moreno, J., concurred.

Except as otherwise noted, unlabeled section references are to the Business and Professions Code.